## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DAMIEN MIKELL, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | Civil No. 1:11-cv-00388 |
| v. | ) | |
| | ) | Judge John E. Jones, III |
| SHIRLEY R. MOORE; FRANKLIN J. | ) | Magistrate Judge Carlson |
| TENNIS; ROBERT MARSH; BRIAN | ) | |
| THOMPSON; MELINDA SMITH; LYNN | ) | |
| EATON; ROBERT VANCE; DALE | ) | |
| DAVIS; and CRAIG HARPSTER, | ) | |
| | ) | |
| *Defendants.* | ) | |

**PLAINTIFF DAMIEN MIKELL'S RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## I.      INTRODUCTION

Plaintiff Damien Mikell brings this lawsuit pursuant to 42 U.S.C. § 1983 due

to the violation of his rights under the Eighth Amendment of the U.S. Constitution.

On February 20, 2009 while incarcerated at the State Correctional Institution at

Rockview ("SCI-Rockview"), Mr. Mikell was violently attacked and tied up as a

fire was started in his cell.  This attack occurred within minutes of being celled

with Inmate Middleton, an inmate with an extensive history of violence, mental

instability and death threats against potential cellmates.  Despite his placement in

the Restricted Housing Unit ("RHU") until such time as he stopped making violent

threats against potential cellmates, Defendants failed to ensure that Inmate Middleton was housed in a single cell. Defendants' deliberate indifference to the danger Inmate Middleton posed to cellmates resulted in a failure to protect Mr. Mikell in violation of his Eighth Amendment rights. For the reasons discussed below, Defendants' Motion for Summary Judgment should be denied.

## II.   STATEMENT OF FACTS

### A. SUMMARY OF FACTS

On February 20, 2009, Defendant Davis informed Mr. Mikell that he had a new cell assignment and brought him to Inmate Middleton's cell. Plaintiff's Counterstatement of Material Facts ("CSMF"), ¶¶110-11. Mr. Mikell knew of Inmate Middleton's violent and unstable reputation as well as his ongoing death threats against potential cellmates. *Id*. at ¶¶112-13. Fearing for his safety, Mr. Mikell asked Defendant Davis if he could move to a different cell. *Id*. at ¶114. Defendant Davis responded by asking Mr. Mikell if he was refusing a direct order. *Id*. at ¶115. Refusing an order is an infraction punishable with a misconduct and up to 90 days in disciplinary custody. *Id*. at ¶116. Mr. Mikell replied that he was not disobeying an order and entered the cell. *Id*. at ¶118. Shortly thereafter Inmate Middleton punched Mr. Mikell in the jaw, knocking him unconscious. *Id*. at ¶120. When Mr. Mikell regained consciousness, his hands were tied behind his back, a fire had been set in the cell and Inmate Middleton was on top of Mr. Mikell

punching him. *Id*. at ¶121. After perceiving the smoke, correctional officers entered the cell, separated Inmate Middleton and Mr. Mikell and took Mr. Mikell to the medical department for an examination. *Id*. at ¶123.

Staff at SCI-Rockview describe Inmate Middleton as "violent in nature with a nothing to lose attitude" and a "threat to the safety and security of the institution." *Id*. at ¶85. Prior to the assault on Mr. Mikell, Inmate Middleton received numerous misconducts for refusing to take a cellmate and assaulting other prisoners. *Id*. at ¶189. In the fall of 2008, Inmate Middleton was confined to the RHU for refusing to double cell and threatening potential cellmates. *Id*. at ¶20. He repeated his threats to multiple members of prison staff including comments that he was "waiting for them to put someone in here with me so I can kill him." *Id*. at ¶27. On three separate occasions, the Program Review Committee ("PRC") continued Inmate Middleton's confinement in the RHU until he was willing to double cell. *Id*. at ¶28. At the time of the attack on Mr. Mikell, Inmate Middleton was still housed in the RHU for refusing to accept a cellmate. *Id*. at ¶¶100, 102, 108.

A "Z Code" is a housing status assigned to inmates who must be single celled. *Id*. at ¶71. At SCI- Rockview, Z Codes can be assigned to prisoners who, amongst other criteria, pose a threat of assaultive behavior to others. *Id*. at ¶72. The PRC makes decisions regarding housing assignments, including continued

confinement in the RHU and the issuance of Z Codes. *Id*. at ¶¶74-75. To aid in their decision-making process, the PRC has access to an inmate's complete institutional file including misconducts and reports from staff. *Id*. at ¶78. The PRC also has the ability to temporarily assign a Z Code to ensure inmate safety. *Id*. at ¶79. Despite Inmate Middleton's apparent mental instability, violent history and death threats to cellmates, Defendants did not issue Inmate Middleton a Z Code or otherwise ensure that he remained single celled. *Id*. at ¶101. As a result, on February 20, 2009, Mr. Mikell was placed in a cell with Inmate Middleton and brutally attacked. *Id*. at ¶¶118, 120-21. As a result of the assault, Mr. Mikell experienced jaw, back and shoulder pain as well as emotional and mental suffering. *Id*. at ¶124.

A Counterstatement of Material Facts with additional details is submitted under separate cover and is incorporated by reference.

### B. PROCEDURAL HISTORY

Mr. Mikell filed the original complaint in this action *pro se* on March 1, 2011. (Doc. 1). Defendants filed a Motion for Summary Judgment on September 17, 2012. (Doc. 59). On August 22, 2013 this Court recommended partially granting the Defendants' Motion for Summary Judgment holding that "with respect to Defendants Thompson, Smith, Eaton, Vance, and Davis there remain disputed issues of fact which make summary judgment inappropriate." (Doc. 73 at

9). This report and recommendation was adopted by Judge Jones on September 9, 2013. (Doc. 75).

Defendants filed a second Motion for Summary Judgment on February 24, 2014. (Doc. 96). Mr. Mikell secured the assistance of counsel in March 2014. (Doc. 101). Defendants agreed to supplement discovery which was completed in June 2014. (Doc. 106). Mr. Mikell now files this Brief in Opposition to Defendants' Motion for Summary Judgment.

## III.  ARGUMENT

### A. STANDARD OF REVIEW

Summary judgment is only appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). All that is required to survive a summary judgment motion is that "sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

B. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON MR. MIKELL'S EIGHTH AMENDEMENT CLAIMS

The Eighth Amendment places a duty on prison officials "to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (citations omitted). Prison conditions may be harsh, but "[b]eing violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" *Id*. at 833-34 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). To survive summary judgment on a failure to protect claim, a plaintiff must establish that (1) the harm is "objectively, sufficiently serious" and (2) the prison official has "a sufficiently culpable state of mind." *Beers-Capitol v. Whetzel*, 256 F.3d 120, 125 (3d Cir. 2001) (quoting *Farmer*, 511 U.S. at 834). "In prison-conditions cases, 'that state of mind is one of deliberate indifference to inmate health or safety.'" *Beers*, 256 F.3d at 125 (quoting *Farmer* 511 U.S. at 834).

"Deliberate indifference is a subjective standard" whereby the plaintiff must show that the defendants were actually "aware of the excessive risk to inmate safety." *Beers*, 256 F.3d at 125. However, an inmate "need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer*, 511 US at 842.

Knowledge of a substantial risk is a question of fact that "can be proved indirectly by circumstantial evidence." *Beers*, 256 F.3d at 131.  A factfinder may find that an official "knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842.  The focus of the knowledge requirement concerns "the general concept of risk," rather than the victim's identity.  *Nestor v. Dir. of Ne. Region Bureau of Prisons*, CIV. 11-4683 RBK/AMD, 2012 WL 6691791, *5 (D.N.J. Dec. 20, 2012).  "It does not matter…whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." *Farmer*, 511 U.S. at 843.

Defendants knew that housing any individual with Inmate Middleton created a substantial risk of harm.  They were aware of his violent history, mental instability and repeated threats to kill any cellmate he was given.  Despite this knowledge, Defendants deliberately chose to deny Inmate Middleton a Z Code and failed to take any steps to ensure that Inmate Middleton remained single celled while housed in the RHU for refusing to double cell.  This failure resulted in Mr. Mikell being violently assaulted by Inmate Middleton.  Accordingly, Defendants' Motion for Summary Judgment should be denied.

i.  Defendants Thompson and Smith Were Deliberately Indifferent to the Substantial Risk of Serious Harm Posed by Inmate Middleton.

As members of the PRC, Defendants Smith and Thompson knew the substantial risk of harm created by placing a cellmate with Inmate Middleton.  "A factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."  *Farmer*, 511 U.S. at 828; *see also* 1 W. LaFave & A. Scott, *Substantive Criminal Law* § 3.7, p.335 (1986) ("If the risk is obvious, so that a reasonable man would realize it, we might well infer that [the defendant] did in fact realize it").[1]  The PRC has access to an inmate's full institutional file including documentation from misconducts and misconduct hearings, information relating to the refusal of cellmates, any threats made by the inmate, and mental health records.  CSMF ¶78.  The PRC reviews this information when evaluating whether to issue specific housing classifications, such as Z codes,

---

[1] Defendants cite to *Reed v. Harpster*, Civ. No. 3-CV-09-1618, 2012 U.S. Dist. LEXIS 96611 (M.D. Pa. July 12, 2012), as a "case with strikingly familiar facts" where the court found no evidence to support a finding of deliberate indifference. Defendants' Brief in Support of Their Motion for Summary Judgment, Doc. 99 at p.6 n.2.   Although both cases involve Defendant Thompson seemingly implementing an institutional policy to ignore threats of potential cellmate violence in favor of stemming the tide of inmates "manipulating the system" to obtain Z Codes, the similarities end there.  Unlike Inmate Middleton, the attacking inmate in *Reed* admitted that he did not meet the Z Code requirements, had never assaulted another inmate, and only vaguely stated "a danger does exist."  *Id.* at *2; CSMF ¶¶81, 87-88.  Furthermore, the plaintiff in *Reed* made no objections to being celled with his future attacker while Mr. Mikell was aware of Inmate Middleton's violent and unstable reputation and objected to the placement out of fear for his safety. *Id.* at *3; CSMF ¶¶112-114.

and in determining whether to continue an inmate's stay in administrative custody. *Id*. The PRC conducted such a review of Inmate Middleton's file on numerous occasions. *See id*. at ¶81.

Inmate Middleton's file demonstrates that staff view him as "violent in nature with a nothing to lose attitude" and a "threat to the safety and security of the institution." *Id*. at ¶85. There are multiple instances of both violent conduct and mentally unstable behavior. *Id*. at ¶89. His adamance in obtaining a Z code resulted in at least five misconducts and several months confined to the RHU. *Id*. Inmate Middleton's dangerous mental state was further demonstrated in misconduct hearings where he stated "if I'm not fit to live in society, I'm definately (sic) not gonna live in a cell with another inmate. It's non-negotionable (sic), because I'm very unstable and mentally fragile." *Id*. at ¶90. Additionally, there were numerous instances of death threats including informing staff that he was "waiting for them to put someone in here with me so I can kill him" and stating "I don't want to have to kill nobody – slice nobody's throat." *Id*. at ¶¶92, 94. Inmate Middleton also repeated his threats to both Defendants Thompson and Smith during the PRC's weekly rounds to review RHU inmates.[2] *Id*. at ¶99.

---

[2] Defendants rely on *Wise v. Ranck*, 1:07-cv-01899, 2008 U.S. Dist. LEXIS 90306 (M.D. Pa. Nov. 6, 2008), for the proposition that threats by inmates are too common to impute actual knowledge. (Doc. 99 at p.10). This misstates the holding. In *Wise,* the court found that common threats between inmates did not, "under all circumstances," impute actual knowledge. *Wise*, 2008 U.S. Dist. LEXIS

Moreover, as members of the PRC, Defendants Smith and Thompson were in a unique position to prevent the harm. The PRC has the ability to grant not only "permanent" Z Code status but also to issue temporary Z Codes when necessary to ensure the security of the institution and other inmates. *Id*. at ¶23. Despite the obvious risks Inmate Middleton posed to cellmates, the PRC, including Defendants Smith and Thompson, unreasonably chose to ignore these risks and gamble that Inmate Middleton was simply trying to manipulate the Z Code system.

At the time of the attack, Inmate Middleton was housed in the RHU for refusing to accept and threatening to kill potential cellmates. CSMF ¶¶100, 102, 108. In the months preceding the attack, the PRC reviewed his confinement three times, each time ordering that he stay in administrative custody until he was willing to accept a cellmate. *Id*. at ¶28. The last of these reviews occurred on February 5, 2009, fifteen days before the assault on Mr. Mikell. *Id*. at ¶100. At no time did the PRC take any steps to ensure that Inmate Middleton remained single celled. As a direct result of their deliberate indifference to the substantial risk of harm created by celling another inmate with Inmate Middleton, Mr. Mikell was

---

90306 at *13-14. The inmate in *Wise* made a one time threat of violence towards another inmate which was relayed to prison staff in the context of both inmates wanting to fight. *Id.* at *4. Inmate Middleton, on the other hand, made multiple death threats towards any potential cellmate. CSMF ¶¶102-103.

assaulted.[3]  *Id.* at ¶¶28, 102-03, 108, 110, 120-21.  These facts are sufficient to show Defendants Thompson and Smith's awareness of a substantial risk of serious harm.  For that reason, Defendants' Motion for Summary Judgment should be denied.

    ii.   <ins>There is a Material Dispute of Fact Relating to Defendants Eaton and Vance's Knowledge of the Substantial Risk Inmate Middleton Posed to Cellmates.</ins>

Defendants Eaton and Vance were deliberately indifferent to a substantial risk to inmate safety when they knowingly failed to take any steps to ensure that Inmate Middleton did not harm a cellmate.  Defendants Eaton and Vance contend that they were not aware of Inmate Middleton's violent nature or any threats he made. However, Inmate Middleton repeated his threats against cellmates and his demands for a Z code to both Defendants Eaton and Vance on multiple occasions. CSMF ¶103.  He also submitted several request slips addressed to each Defendant on the issue.  *Id.*

Defendants Eaton and Vance have stated that in their positions as Security Lieutenant and Captain, they have the ability to place dangerous inmates in a single cell in administrative custody to ensure the safety of the institution and other

---

[3] Notably, after the assault on Mr. Mikell, the PRC unanimously voted to assign Inmate Middleton a Z Code based on his "extensive history of violent offenses and aggression towards other inmates."  CSMF ¶125.  This "extensive history" of violence consisted primarily of information before the PRC prior to the assault on Mr. Mikell.  *Id.* at ¶126.

inmates.  *Id*. at ¶¶104-05.  Their failure to do so after becoming aware of Inmate

Middleton's threats establishes their deliberate indifference to a substantial risk of

harm.  "[P]urposeful or knowing conduct is not . . . necessary to satisfy the *mens*

*rea* requirement of deliberate indifference." *Farmer*, 511 U.S. at 836.  "[I]t is

enough that the official acted or failed to act despite his knowledge of a substantial

risk of serious harm."  *Id*. at 842.  Consequently, there remain disputed issues of

material fact and summary judgment should not be granted.

> iii.  There is a Material Dispute of Fact Regarding Defendant
> Davis' Deliberate Indifference to the Substantial Risk of Harm
> Inmate Middleton Posed to Mr. Mikell.

As with Defendants Eaton and Vance, there is a material dispute of fact as to

whether Defendant Davis was aware of the substantial risk Inmate Middleton

posed to cellmates and whether he acted unreasonably in disregarding this risk.

Defendant Davis was the regular corrections officer in the RHU during the months

immediately preceding the attack on Mr. Mikell.  CSMF ¶¶107-08.  He was

familiar with Inmate Middleton and the reasons for his confinement to the RHU.

*Id*. at ¶108.  Inmate Middleton told Defendant Davis he was refusing to take a

cellmate and threatening any potential cellmates.  *Id*. at ¶¶28, 37, 88.

Contrary to statements made by Defendant Davis, Inmate Middleton and Mr.

Mikell assert that he never approached them regarding their willingness to cell

together.  *Id*. at ¶¶37-38.  On February 20, 2009, Mr. Mikell was brought directly

to Inmate Middleton's cell after returning from the yard. *Id.* at ¶110.  Mr. Mikell knew of Inmate Middleton's violent and unstable reputation as well as his ongoing death threats against potential cellmates.  *Id.* at ¶¶112-13.  Mr. Mikell feared for his safety and asked Defendant Davis if he could be assigned to a different cell.  *Id.* at ¶114.  Defendant Davis responded by asking if Mr. Mikell was refusing a direct order.  *Id.* at ¶115.  To avoid discipline, Mr. Mikell replied that he was not disobeying an order and entered the cell.  *Id.* at ¶118.  Defendant Davis' actions in placing Mr. Mikell in a cell with Inmate Middleton, over Mr. Mikell's objections when he knew Inmate Middleton was dangerous, show a deliberate failure to act that violates the Eighth Amendment.  This evidence is "sufficient to raise a genuine issue of fact as to whether [Defendant Davis was] aware of the significant risk that [Inmate Middleton] posed to the plaintiff but did not adequately respond to this risk." *Beers*, 256 F.3d at 125-6.  Summary judgment is therefore inappropriate at this time and should be denied.

### C. DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY

Defendants are not entitled to qualified immunity.  Qualified immunity shields state officials from suit where their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982); *Williams v. Bitner*, 455 F.3d 186, 190 (3d Cir. 2006).  The Supreme Court has outlined two elements

to analyzing qualified immunity: (1) whether the facts alleged show that the defendant's conduct violated a constitutional or statutory right and (2) whether the right was "clearly established" at the time the violation occurred.  *See Saucier v. Katz*, 533 U.S. 194 (2001); *Yarris v. Delaware County*, 465 F.3d 129, 140-41 (3d Cir. 2006).  There is no mandate as to which prong must be resolved first. *See Pearson v. Callahan,* 555 U.S. 223, 236 (2009).

A right is clearly established for purposes of qualified immunity when its contours are "sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Saucier*, 533 U.S. 194, 202 (2001).  At the time of Defendants' conduct in 2009, it was well-settled in this Circuit that correctional officers have a duty to protect inmates from threats within a prison. *See Farmer*, 511 U.S. at 833 ("prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners."); *Philadelphia Police & Fire Ass'n for Handicapped Children, Inc. v. City of Philadelphia*, 874 F.2d 156, 167 (3d Cir. 1989) ("the state continues to owe an affirmative duty to protect those physically in its custody.")

Defendants' qualified immunity argument must fail.  As discussed in detail above, each defendant knowingly and unreasonably failed to protect Mr. Mikell from the substantial risk of harm created by being assigned as a cellmate to Inmate Middleton.  The test for qualified immunity is objective reasonableness.  *Beers*,

256 F.3d at 142 n.15 (quoting *Stoneking v. Bradford Area Sch. Dist.,* 882 F.2d 720, 726 (3d Cir. 1989)).   "Conduct that is deliberately indifferent to an excessive risk…cannot be objectively reasonable conduct." *Beers*, 256 F.3d at 142 n.15. Consequently "acts of deliberate indifference to an excessive risk…foreclose [Defendants'] claim of qualified immunity." *Id*. at 126 n.1.

"Where [a] plaintiff has made a case of failure to protect, qualified immunity does not shield an officer from liability for that failure." *Nicholas v. Carter*, 736 F. Supp. 2d 866, 875 (D. Del. 2010); *see also Beers*, 256 F.3d at 142 n.15 (citing *Carter v. City of Philadelphia*, 181 F.3d 339, 356 (3d Cir. 1999)) ("Conduct that is deliberately indifferent to an excessive risk . . . cannot be objectively reasonable conduct.").   Mr. Mikell has presented sufficient evidence "to overcome summary judgment on the merits," and therefore he has "also made a showing sufficient to overcome any claim to qualified immunity." *Beers*, 256 F.3d at 142 n.15.

## IV.   CONCLUSION

For the foregoing reasons, this Court should deny Defendants' Motion for Summary Judgment.

Respectfully submitted,
/s/ Alexandra Morgan-Kurtz
Attorney ID:  PA 312631
Pennsylvania Institutional Law Project
429 Forbes Ave, Suite 800
Pittsburgh, PA 15219
T:  (412) 434-6175

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DAMIEN MIKELL,                          )
                                        )
        *Plaintiff,*                    )
                                        )         Civil No. 1:11-cv-00388
        v.                              )
                                        )         Judge John E. Jones, III
SHIRLEY R. MOORE; FRANKLIN J.           )         Magistrate Judge Carlson
TENNIS; ROBERT MARSH; BRIAN             )
THOMPSON; MELINDA SMITH; LYNN           )
EATON; ROBERT VANCE; DALE               )
DAVIS; and CRAIG HARPSTER,              )
                                        )
        *Defendants.*                   )

## CERTIFICATE OF SERVICE

I, Alexandra Morgan-Kurtz, certify that on July 16, 2014, I caused to be served a true and correct copy of the foregoing brief, along with all accompanying attachments upon the following via ECF:

Maryanne M. Lewis                    Lindsey A. Bierzonski
Office of Attorney General           PA Office of Attorney General
Civil Litigation Division            Strawberry Square
15th Floor                           15th Floor
Strawberry Square                    Harrisburg, Pa 17120
Harrisburg, Pa 17120

                                     /s/ Alexandra Morgan-Kurtz
                                     Attorney ID:  PA 312631
                                     Pennsylvania Institutional Law Project
                                     429 Forbes Ave, Suite 800
                                     Pittsburgh, PA 15219
                                     T:  (412) 434-6175
                                     amorgan-kurtz@pailp.org